UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

REBECCA POPEK,

     Plaintiff,

  v.

PRIME SOURCE,

     Defendant.

Case No. C22-5283-BHS-SKV

REPORT AND RECOMMENDATION

## INTRODUCTION

In this removed civil lawsuit, Plaintiff Rebecca Popek raises employment-related claims under Washington's Law Against Discrimination (WLAD) and names Prime Source as Defendant. Dkt. 1-2. Plaintiff alleges Defendant violated the WLAD through a hostile work environment and discriminatory termination because of her gender, retaliation following her complaint about sexualized comments made by her supervisor, and disparate treatment through a written warning for allegedly eating at her desk while male co-workers who engaged in the same conduct were not disciplined. *Id.*

Now pending before the Court is a Motion for Summary Judgment filed by PrimeSource Building Products, Inc. (PrimeSource), Dkt. 17, Plaintiff's prior employer and the entity properly

1    named as Defendant, *see id*. at 1, n.1.  Defendant disputes Plaintiff's allegations and argues its

2    entitlement to dismissal of all of Plaintiff's claims on summary judgment.  Defendant asserts, for

3    example, that Plaintiff was given a written warning due to her failure to follow Defendant's

4    COVID-19 policies and was terminated because her performance fell below expectations.

5    Plaintiff, in response, concedes her hostile work environment claim should be dismissed, stating

6    the single sexual comment alleged is unlikely to achieve the level necessary to establish a hostile

7    work environment.  Dkt. 21 at 23.  She otherwise opposes Defendant's motion.

8            The Court has considered the motion, response, and all documents filed in support and

9    opposition.  With that consideration, the Court recommends Defendant's Motion for Summary

10   Judgment be GRANTED and that all of Plaintiff's claims be DISMISSED.[1]

11                                   BACKGROUND

12           Plaintiff began working for PrimeSource in June 2021.  Dkt. 22, ¶1.[2]  She held the

13   position of Operations Coordinator at PrimeSource's distribution center in Sumner, Washington,

14   and was supervised by David Blankenship, the Distribution Manager at the same location.  Dkt.

15   19, ¶¶1, 4; Dkt. 22, ¶1.  As described by Blankenship, Plaintiff's job responsibilities included,

16   *inter alia*, coordinating and tracking shipments in and out of the warehouse, organizing the

17

18

19   _____

20           [1] In its reply, PrimeSource requests an award of fees and costs for litigating and preparing a
     summary judgment motion on the hostile work environment claim, stating Plaintiff knew from the outset
21   it lacked sufficient severity to rise to the level of a cognizable claim.  However, any such request is
     premature and not addressed herein.

22           [2] Plaintiff contends that PrimeSource's factual allegations are largely correct from a
     chronological standpoint, but contextually inaccurate and missing significant factual details.  The Court
23   herein describes events associated with Plaintiff's employment as shown through the documentation
     submitted by the parties.  The Court addresses arguments as to the meaning and import of that evidence
     below.

fulfillment of orders and receiving, processing paperwork, routing orders, and serving as the point person for sales communications.  Dkt. 18-1 at 5-6 (20:9-21:15).

In early October 2021, Blankenship created a checklist to assist Plaintiff in completing her duties.  *Id*. at 11-12 (37:1-38:10); Dkt. 18-2 at 32-35; Dkt. 19, ¶7; Dkt. 22, ¶8.  In an email exchange on October 26, 2021, Ryan Miller, Blankenship's supervisor, described missing "CSR codes" as an ongoing issue and Plaintiff acknowledged she bore responsibility for that task.  Dkt. 18-2 at 36.  *See also id*. at 9-10 (115:2-116:13).

In a Mid-Year Review completed on or around October 26, 2021, Blankenship stated Plaintiff "does a good job being timely and helpful" to customers, "makes sure that everything ships out on the tracks and re sends [sic] deliveries as needed[,]" and "has helped overcome the poor performance of our dedicated carrier."  Dkt. 18-1 at 48.  He further stated:

> Rebecca needs improvement on the quality aspect of her role as operations coordinator.  She makes simple mistakes such as saving files to the incorrect drive and failing to put CSR codes on LTL.  Rebecca will need to focus on completing her work error free for the remainder of the review period. . . .  Rebecca needs to be more open to coaching and help.  She is very defensive when being corrected and as a result does not learn quickly from her mistakes. . . .  Rebecca was provided a daily checklist to help ensure she does not miss key functions.  She was reluctant to use it and had to receive stern coaching in order to get her to use the list.

*Id*. at 49-51.

On November 4, 2021, Miller sent an email asking whether an order had shipped and Blankenship responded:  "It was missed by Rebecca.  I called her in and spoke to her about it and she corrected it."  Dkt. 19, ¶7, Ex. A.  Emails later that month reflect that Blankenship was informed of outstanding "unbilled RMA[s]", meaning undelivered materials returned on trucks, and directed Plaintiff to clean them up that day.  *Id*., ¶8, Ex. B; Dkt. 22, ¶7.  On December 13,

2021, Blankenship was alerted that an order had been sent to the wrong location due to Plaintiff's error.  Dkt. 19, ¶9, Ex. C.

Blankenship issued a written warning to Plaintiff on December 14, 2021.  *Id.*, ¶9.  The "Coaching Form" provided to Plaintiff describes the delivery error and an incident in which Plaintiff was reminded to respond to sales emails before leaving for the day.   Dkt. 23, ¶1, Ex. A. It states:

> Rebecca lacks focus while performing her job.  She has tools such as checklists
> and calendar reminders that are being signed as complete but not being
> completed. . . .  Rebecca needs to show immediate improvement on the critical
> areas of her job.  Rebecca needs to use the daily check lists and training aids to
> insure [sic] her performance.

*Id.*  On the day after the warning, Blankenship emailed Plaintiff a list of files and asked her to "clean [them] up."  Dkt. 18-2 at 16-17 (121:10-122:5), 44.

Blankenship spoke to Plaintiff and another employee about warehouse conditions on December 22, 2021.  Dkt. 22, ¶13.  He was angry and in a foul mood.  *Id.*  In an email sent shortly after this conversation, Blankenship admonished Plaintiff as follows:   "Rebecca – No more eating at your desk.  I want you to take your scheduled breaks and lunch and eat.  If you want to arrive early and eat [in the] lunchroom or your car I am fine with that.  You need to be in a mask in that office at all times."  Dkt. 23, Ex. I.  Blankenship also emailed Shawna Rodriguez, PrimeSource's Director of Human Resources, and asked to speak about Plaintiff.  Dkt. 18-1 at 53; Dkt. 20, ¶1.  He was "really having struggles" with Plaintiff, her continued mistakes were "greatly impacting the business[,]" and, after a conversation that same day, she "got upset and went home[.]"  Dkt. 18-1 at 53; *see also id.* at 28-29 (76:2-77:25).

1    On December 23, 2021, Plaintiff called Human Resources and spoke with Kassi Hill.[3]

2  Dkt. 22, ¶15.  Plaintiff told Hill that, in October 2021, Blankenship accused her of using her sex

3  to influence the behavior of male co-workers.  *Id.*, ¶12.  On another occasion, Blankenship asked

4  Plaintiff if she experienced anxiety.  *Id.*  Plaintiff was offended by both comments, but tolerated

5  them because she was a new employee and valued her job.  *Id.*

6    Rodriguez attests that she and Hill investigated Plaintiff's claim, including conducting

7  interviews, and closed the investigation on the same day it was received upon finding no

8  evidence to substantiate the allegations.  Dkt. 20, ¶4.  *See also* Dkt. 25, Ex. C at 13:2-14:20

9  (Rodriguez testified that the investigation included conversations with both Blankenship and

10  Miller, that both individuals denied Plaintiff's allegations, and that both individuals were

11  provided coaching).  After her conversation with Hill, Plaintiff did not hear from Rodriguez or

12  anyone else in Human Resources.  Dkt. 22, ¶¶15-16.  She asserts "[t]here was no thorough

13  investigation regarding his sexual comment."  *Id.*, ¶16.

14    On December 28, 2021, Plaintiff had a conversation with Blankenship and Miller.  *Id.*,

15  ¶¶3, 14.  Miller's notes of the conversation show they discussed Plaintiff starting work an hour

16  prior to her scheduled start time and "[e]ating at her desk, which is in a public and high-volume

17  area . . . while mask mandate is in place."  Dkt. 23, Ex. U.  The notes show Plaintiff's

18  explanation that her early arrival was directed by another employee and that "she was asked to

19  avoid eating and snacking at the desk and lost track, but she would comply going forward."  *Id.*

20  She noted another employee ate at their desk and Blankenship "advised that he had not observed

21  but would address."  *Id.*  Plaintiff also "voice[d] a concern on her training and felt she needed

22

23

---

[3] Plaintiff depicts Hill as an assistant to Rodriguez.  Dkt. 22, ¶15.  Rodriguez testified Hill is "one of [her] direct reports."  Dkt. 25, Ex. C at 9:20-10:2.

1    more support to get up to speed[,]" a request Miller found unusual because he had "observed her

2    successfully performing her daily tasks." *Id*.

3        On the same day of this conversation, Blankenship emailed Rodriguez, noting the issue

4    of Plaintiff's early arrival and stating she was twice observed eating at her desk, despite a

5    reminder in the interim about wearing a mask. Dkt. 18-1 at 54. Rodriguez responded that

6    Plaintiff could be written up for not abiding by the rules. *Id*.

7        Blankenship gave Plaintiff a final written warning through a Coaching Form dated

8    December 29, 2021. Dkt. 19, ¶11; Dkt. 23, ¶¶2-3, Exs. B & C (unsigned and signed versions

9    dated December 28th and 29th of 2021). The warning states:

10           On 12/28/21 Rebecca was reminded to not eat at her desk when she arrived for
             work and was eating at her desk. Then again at her lunch break the same day she
11           took her 30 minutes for lunch [t]hen returned, clocked back in, and started to eat
             her lunch at her desk.
12

13   Dkt. 23, Ex. C. The warning further states that Plaintiff "is continuously reminded to wear a

14   mask while in her workplace inside[,]" and that she had been "instructed not to eat at her desk

15   and received an email instructing this on 12/21/21." *Id*.

16       On December 30, 2021, Plaintiff exchanged emails with Chris Willis, Rodriguez's

17   superior. Dkt. 22, ¶16; Dkt. 18-2 at 48-51. Plaintiff stated Blankenship had not previously

18   objected to her eating at her desk, that she had done so throughout her employment, that other

19   employees were allowed to eat at their desks, and that COVID-19 protocols had not been

20   followed in the past. Dkt. 18-2 at 49. Plaintiff asked why she was "being targeted", stating: "So

21   after I voice my harassment case to you guys as HR and now this? I am the victim. Retaliation.

22   Harassment and singled out and no one seems to care. I have witnesses and documentation.

23   Picture's [sic] and all." *Id*. at 50. Willis advised Plaintiff he had asked Rodriguez to call

1    Plaintiff, and Plaintiff replied: "Thank you!  [Rodriguez] called me.  We are good now."  *Id*. at

2    48-49.  *But see* Dkt. 22, ¶17 ("I sent [this email] to Mr. Willis, Ms. Rodrigues' [sic] boss

3    specifically she did not call me hoping to get some type of response [sic].  It never came.")

4            In an undated 2021 Year End Review for the period of January 2nd through December

5    31st, Blankenship states with regard to Plaintiff's customer service:  "Rebecca has continued to

6    provide good customer service to the will call customers.  She advocates for them when the

7    process is slow getting orders from the sales team."  Dkt. 23, ¶5, Ex. F.   The review otherwise

8    cites a need for improvement and unsatisfactory performance, stating:

> Rebecca has been continually late on completed needed reports.  These reports
> such as daily screen checks and the route tracker, provide important data to our
> performance. . . .  Rebecca needs to complete these checklist items on a daily
> basis within the proper time required.  . . .  Rebecca has numerous failures each
> week on CSR codes.  She has been explained how important these items are for
> corporate tracking purposes. . . .  Rebecca has also struggled in creating accurate
> load sheets every day.  This is a direct result of lack of focus on the task at hand. .
> . . Some functions have been removed from Rebecca due to her failures. . . .
> Rebecca has continued to not use the checklist as a daily tool to reduce errors.
> She failures [sic] to run and send the stocking report as well as work the past due
> report.  She only performs these functions after constant reminding. . . .  Rebecca
> is on a final written warning for failure to follow these instructions as well as
> other issues. . . .   Rebecca will need major improvement in her performance for
> 2022.

*Id*. at 4-5, 7.

        In an email dated January 4, 2022, Blankenship asked Plaintiff to "get our daily route

tracker caught up[]" before she left for the day.  Dkt. 18-2 at 52.  *See also id*. at 27-29 (148:4-

149:25).  On January 7, 2022, Blankenship emailed Plaintiff asking why she was not responding

to the sales team about an order.  Dkt. 19, ¶12, Ex. E (Plaintiff:  "I will respond to these.  Get

these taken care of.")  On January 19, 2022, Blankenship was advised that an order placed on

January 7th had not shipped, raising a question for Blankenship as to whether she had been

conducting her "nightly screen checks" where the order would have appeared.  Dkt. 18-2 at 53-

56; Dkt. 19, Ex. F.  Plaintiff stated she had been conducting the checks, but missed the order.

Dkt. 18-2 at 53-54.  Also, January 24, 2022 emails between Plaintiff and Blankenship reflect that

an order had to be canceled because PrimeSource did not have materials to fulfill the order.  Dkt.

19, ¶13, Ex. F.

In late January 2022, Blankenship emailed Plaintiff's attendance record to Rodriguez.

Dkt. 23, Ex. S.  In an email to Hill the next day, Rodriguez noted Blankenship would be

terminating Plaintiff the following week, and attached various items for Plaintiff's file, including

"[f]ailure to meet standards evidence[.]"  *Id*., Ex. T.  Plaintiff's employment was terminated for

failure to meet expectations on February 3, 2022.  Dkt. 19, ¶15, Ex. G.

<u>DISCUSSION</u>

A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate when there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A party seeking

summary judgment must inform the Court of the basis for its motion, and identify the portions of

the pleadings, discovery responses, or other materials that demonstrate the absence of a genuine

issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where the moving party will have the burden of proof on an issue at trial, the movant

must affirmatively demonstrate that no reasonable trier of fact could find other than for the

movant.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-

moving party will have the burden of proof at trial, the moving party can carry its initial burden

by either producing evidence that negates an essential element of the non-moving party's claim,

*or* by establishing the absence of evidence to support an essential element of the non-moving

party's claim.  *See James River Ins. Co. v. Herbert Schenk, P.C.*, 523 F.3d 915, 923 (9th Cir.

1  2008); *Soremekun*, 509 F.3d at 984 (citing *Celotex Corp.*, 477 U.S. at 323); *Nissan Fire &*

2  *Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden then

3  shifts to the nonmoving party to establish a genuine issue of material fact.  *Matsushita Elec.*

4  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

5         In determining whether an issue of fact exists, the Court must view all evidence in the

6  light most favorable to the nonmoving party and draw all reasonable inferences in that party's

7  favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co.*,

8  475 U.S. at 587.  A genuine issue of material fact exists where there is sufficient evidence for a

9  reasonable factfinder to find for the nonmoving party.  *Anderson*, 477 U.S. at 248.  The inquiry is

10  "whether the evidence presents a sufficient disagreement to require submission to a jury or

11  whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251–52.

12  B.    Washington's Law Against Discrimination

13         Under the WLAD, an employee has the "right to obtain and hold employment without

14  discrimination" based on, among other things, the employee's sex.  RCW 49.60.010 &

15  49.60.030(1)(a).  The WLAD also prohibits retaliation against an employee who opposes

16  practices prohibited under the statute.  RCW 49.60.210.  It provides for a private action for

17  damages and other remedies.  RCW 49.60.030(2).

18         A plaintiff may offer direct evidence of an employer's discriminatory intent.  *Alonso v.*

19  *Qwest Commc'ns Co.*, 178 Wn. App. 734, 743-44, 315 P.3d 610 (2013) (employee may show

20  "(1) the defendant employer acted with a discriminatory motive and (2) the discriminatory

21  motivation was a significant or substantial factor in an employment decision.")  Because direct

22  evidence of discriminatory animus is rare, a plaintiff may also rely on "circumstantial, indirect,

23  and inferential evidence to establish discriminatory action."  *Mikkelsen v. Pub. Util. Dist. No. 1*,

189 Wn. 2d 516, 526, 404 P.3d 464 (2017) (citation omitted).  With such evidence, the Court

employs the *McDonnell Douglas*[4] burden-shifting framework "to determine the proper order and

nature of proof for summary judgment."  *Scrivener v. Clark College*, 181 Wn. 2d 439, 445, 334

P.3d 541 (2014).  *See also Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 571, 459 P.3d

371 (2020) (the *McDonnell Douglas* burden-shifting framework applies to both discrimination

and retaliation claims) (citations omitted).

       Under the *McDonnell Douglas* test, the employee bears the initial burden of establishing

a prima facie case of discrimination, "which creates a presumption of discrimination."

*Scrivener*, 181 Wn.2d at 446.  This is often a "fairly low bar."  *Mackey*, 12 Wn. App. 2d at 584.

If the employee makes a prima facie showing, the burden shifts to the employer to "articulate a

legitimate, nondiscriminatory reason for the adverse employment action."  *Scrivener*, 181 Wn.2d

at 446.  "This burden is one of production, not persuasion; it 'can involve no credibility

assessment.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  *See also Mikkelsen*, 189 Wn. 2d at 533

("The employer need only introduce 'evidence which, *taken as true*, would *permit* the conclusion

that there was a nondiscriminatory reason for the adverse action.'") (quoting *St. Mary's Honor*

*Ctr.*, 509 U.S. at 509) (emphasis in original).  The ultimate burden of persuasion remains with

the employee to show the employer intentionally discriminated or retaliated against her.  *Reeves*,

530 U.S. at 143.  Accordingly, if the employer meets its burden of production, the burden shifts

back to the employee to produce sufficient evidence to show the employer's purported

nondiscriminatory reason for the adverse employment action was, in fact, a pretext for a

discriminatory purpose.  *Id.*; *accord Scrivener*, 181 Wn.2d at 446.

---

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The provisions of the WLAD are broad and liberally construed by the Court. *Currier v. Northland Servs., Inc.*, 182 Wn. App. 733, 741-42, 332 P.3d 1006 (2014) (citing RCW 49.60.020). "Claims arising under the WLAD are typically inappropriate for resolution at summary judgment because the WLAD mandates liberal construction and the evidence will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." *Gamble v. City of Seattle*, 6 Wn. App. 2d 883, 887-88, 431 P.3d 1091 (2018) (cleaned up and citations omitted). The Court will, however, grant summary judgment against an employee who "fails to raise a genuine issue of fact on one or more prima facie elements." *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 27, 244 P.3d 438 (2010). *See also Marquis v. City of Spokane*, 130 Wn. 2d 97, 105, 922 P.2d 43 (1996) (to survive summary judgment employee "must do more than express an opinion or make conclusory statements[,]" and "must establish specific and material facts to support each element of his or her prima facie case.") (citations omitted). Also, where "the plaintiff has produced no evidence from which a reasonable jury could infer that an employer's decision was motivated by an intent to discriminate, summary judgment is entirely proper." *Kuyper v. State*, 79 Wn. App. 732, 739, 904 P.2d 793 (1995).

C.    Plaintiff's WLAD Claims

Plaintiff concedes her hostile work environment claim should be dismissed. The Court, as such, herein assesses only the remaining, disputed retaliation and disparate treatment claims.

1.    Retaliation:

Plaintiff accuses Defendant of retaliating against her following her report that Blankenship had accused her of using her sex to influence the behavior of male co-workers. She identifies the final warning she received six days after her report and her later termination as

REPORT AND RECOMMENDATION - 11

retaliatory acts.  *See* Dkt. 1-2; Dkt. 24.  Defendant asserts Plaintiff's failure to establish either a prima facie case of retaliation or pretext.  The Court, as discussed below, finds Plaintiff's prima facie case satisfied, but an insufficient showing on pretext.

        a.      <u>Prima facie case of retaliation</u>:

An employee establishes a prima facie case of retaliation by showing (1) she took a statutorily protected action; (2) she suffered an adverse employment action; and (3) a causal link exists between her protected activity and the adverse action.  *Cornwell v. Microsoft Corp.*, 192 Wn. 2d 403, 411, 430 P.3d 229 (2018).  In this case, it does not appear that the parties dispute Plaintiff's satisfaction of the first two elements.  That is, Plaintiff engaged in protected activity by making a complaint to Human Resources and was subsequently given a final written warning and terminated.  The parties do, on the other hand, dispute whether Plaintiff demonstrates a causal link between her protected activity and the adverse employment actions.

Causation is proven "'by showing that retaliation was a substantial factor motivating the adverse employment decision.'"  *Id.* at 412 (quoting *Allison v. Hous. Auth.*, 118 Wn. 2d 79, 96, 821 P.2d 34 (1991)).  Defendant argues Plaintiff cannot show her report to Human Resources was a substantial factor in its decision to discipline her for conduct she had been repeatedly counseled against.  It notes that Plaintiff's termination did not occur until some six weeks after she complained about Blankenship, and argues the termination properly resulted from Plaintiff's well documented and objectively measurable performance problems both prior to and continuing after her complaint.

At the summary judgment stage, Plaintiff's burden to show a causal link between her protected activity and an adverse employment action is "one of production, not persuasion."  *Id.* (citing *Scrivener*, 181 Wn. 2d at 445).  "Retaliation need not be the main reason for the

employment action." *Mackey*, 12 Wn. App. 2d at 575 (citation omitted). "[T]o avoid summary judgment on causation, the employee must show *only* that a reasonable jury could find that retaliation was a substantial factor in the adverse employment decision." *Cornwell*, 192 Wn. 2d at 412-13 (emphasis retained). To make that showing, the employee may rely on the fact "(1) the employee took a protected action, (2) *the employer had knowledge of the action*, and (3) the employee was subjected to an adverse employment action." *Id*. at 413 (citation omitted; emphasis retained). Such a showing provides a rebuttable presumption in favor of the employee. *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn. 2d 46, 69, 821 P.2d 18 (1991).

It is undisputed that Plaintiff engaged in protected activity and was subjected to adverse employment actions, including a final written warning six days after she made a report about Blankenship. Nor is there any dispute that Blankenship had knowledge of the protected activity. Defendant submits evidence showing Rodriguez spoke with Blankenship on December 23, 2021, the same day Plaintiff made her report. Dkt. 18-1, ¶6, Ex. D at 13:2-14:20. *See also* Dkt. 20, ¶4. Plaintiff, as such, makes the necessary showing of a causal link.

Defendant in large part focuses on Plaintiff's termination, arguing Plaintiff's inability to show a causal link to a termination which came six weeks after her report and only after continued deficiencies in her performance. The Court disagrees.

"Washington courts have looked to 'the employer's knowledge of the protected activity and the proximity in time between that activity and the termination' to evaluate causation." *Li v. Northeastern University*, C22-0444-LK, 2023 WL 3722227, at *19, n.19 (W.D. Wash. May 30, 2023) (quoting *Mackey*, 12 Wn. App. 2d at 577; citing *Vasquez v. State*, 94 Wn. App. 976, 985, 974 P.2d 348, 353 (1999) ("Among the factors suggesting retaliatory motivation is proximity in time between the discharge and the protected activity; another factor is satisfactory work

1   performance and evaluations.")).  Termination occurring "some length of time" after protected

2   activity is "less likely to reflect an improper motive[.]"  *Wilmot*, 118 Wn. 2d at 69.  *Cf.*

3   *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[I]n some cases,

4   causation can be inferred from timing alone where an adverse employment action follows on the

5   heels of protected activity[, but] timing alone will not show causation in all cases; . . . to support

6   an inference of retaliatory motive, the termination must have occurred fairly soon after the

7   employee's protected expression.") (cleaned up).  Here, the six weeks between Plaintiff's

8   protected activity and her termination suffices to establish a causal connection.  *See, e.g.*,

9   *Mathews v. Karcher N. Am., Inc.*, No. C21-5732-LK, 2023 WL 3318613, at *8 (W.D. Wash.

10  May 9, 2023) (termination and other adverse action "only five to seven weeks" after protected

11  activity occurred in "such close proximity in time" that they supported an inference of

12  causation); *Erickson v. Biogen, Inc.*, 417 F. Supp. 3d 1369, 1383 (W.D. Wash. 2019) (one month

13  between protected activity and adverse employment action was sufficient proximity to establish

14  causation) (citing *Yartzoff v. Thomas*, 809 F.2d 1371 (9th Cir. 1987) (finding same for adverse

15  actions some two-to-three months after protected activity)).

16      Nor does Defendant undermine Plaintiff's prima facie showing with evidence of

17  continued deficiencies in her performance.  Plaintiff need only show a reasonable jury could find

18  retaliation was a substantial factor in her termination, *Cornwell*, 192 Wn. 2d at 412-13, and it

19  need not have been the main reason, *Mackey*, 12 Wn. App. 2d at 575.  Plaintiff makes that

20  showing and thus satisfies her prima facie case burden.

21      b.    Reasons for adverse actions:

22      Defendant asserts that the final written warning was issued after Plaintiff defied prior

23  instructions to wear a mask in the office and to not eat at her desk, and that she was terminated

1  for failing to perform her job responsibilities in a satisfactory manner. As Plaintiff appears to

2  concede, *see* Dkt. 21, Defendant therefore satisfies its burden of production by offering

3  legitimate, nondiscriminatory reasons for its adverse actions.

4          c.      Pretext for retaliation:

5          Because Defendant offers legitimate, nondiscriminatory reasons for its actions, the

6  burden shifts to Plaintiff to put forth "'specific and substantial'" evidence challenging the

7  credibility of Defendant's motives. *Bell v. Boeing Co.*, 599 F. Supp. 3d 1052, 1069 (W.D. Wash.

8  2022) (quoting *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003)). To survive

9  summary judgment, Plaintiff must produce "sufficient evidence to create a genuine issue of

10  material fact either (1) that the defendant's reason is pretextual or (2) that although the

11  employer's stated reason is legitimate, discrimination [or retaliation] nevertheless was a

12  substantial factor motivating the employer." *Scrivener*, 181 Wn. 2d at 446-47 (citations

13  omitted); *Mackey*, 12 Wn. App. 2d at 572, 583.

14          Under the first option, an employer's nondiscriminatory reason is pretextual if it (1) has

15  no basis in fact, (2) was not really a motivating factor in the decision, (3) was not temporally

16  connected to the adverse action, or (4) was not a motivating factor in employment decisions for

17  other employees in the same circumstances. *Scrivener*, 181 Wn. 2d at 447. Under the second,

18  "[a] 'substantial factor' means that the protected characteristic was a significant motivating

19  factor bringing about the employer's decision." *Id.* at 444. The plaintiff need only show

20  retaliation or discrimination "was a substantial factor in an adverse employment action, not the

21  only motivating factor." *Id.* at 447 ("An employer may be motivated by multiple purposes, both

22  legitimate and illegitimate, when making employment decisions and still be liable under the

23  WLAD."). *Accord Mikkelsen*, 189 Wn.2d at 534.

Plaintiff argues the evidence shows Defendant's reasons were pretextual and that retaliation was a substantial factor in Defendant's adverse actions.  However, unlike her initial prima facie showing, Plaintiff does not satisfy her burden on pretext.

i.    Failure to follow safety-related instructions:

Defendant explains the final written warning issued to Plaintiff on or about December 29, 2021 as based on her defiance of prior instructions to wear a mask in her office and to not eat at her desk.  Blankenship states that Plaintiff's desk was in a communal area frequented by other employees and containing a will-call for walk-up customers.  Dkt. 18-1 at 15-16 (50:5-15, 51:12-21); Dkt. 19, ¶14.  He states that, of the thirteen-to-fifteen other employees at the Sumner location, three held management positions and were allowed to eat in their private, fully enclosed offices, while the remainder of employees could eat in their cars or in the employee lunchroom.  Dkt. 18-1 at 15-18 (50:16-51:11, 53:4-24, 57:21-23).

Plaintiff notes that Defendant gave only oral directives as to COVID-19.  She understood that a mask was required only if someone else was present in the office with her and generally within six feet.  Dkt. 22, ¶2.  She wore a mask when someone else was present, and the mask mandate was frequently not abided by or enforced on warehouse employees.  *Id.*, ¶¶2, 18.

Plaintiff further asserts that, prior to his December 22, 2021 email, Blankenship had never before discussed the issue of Plaintiff eating at her desk.  *Id.*, ¶13.  She denies the allegations in the final warning, stating:   "On December 28, 2021, Mr. Blankenship did not see me eating at my desk in the morning and remind me it that [sic] was not permitted, and then I allegedly came back from lunch in the afternoon and allegedly started eating at my desk.  This did not happen."  *Id.*, ¶14.  Plaintiff ate at her desk only on rare occasions and observed other employees, including eight individuals she identifies by name, eating at their desks or

1    workstations when not in an enclosed room.  *Id.*, ¶¶18-19.  The warehouse staff, all of whom

2    were male, ate in the public lunchroom on a daily basis.  *Id.*, ¶18.

3        Again, Blankenship gave Plaintiff a final written warning six days after she made a report

4    about him to Human Resources.  However, mere temporal proximity between a protected

5    activity and an adverse action does not suffice to demonstrate pretext.  *Mackey*, 12 Wn. App. 2d

6    at 584-85 (contrasting pretext with the "fairly low bar" of the prima facie case).  "[I]n the pretext

7    step, the employee has the burden of establishing a question of fact as to motivation regardless of

8    the employer's evidence that there was a legitimate, nondiscriminatory reason for the [adverse

9    action]."  *Id.* (noting that, if the burden did not involve more than "mere temporal proximity . . .

10   the legitimate, nondiscriminatory reason step and the pretext step would be meaningless any time

11   there was temporal proximity between protected activity and termination.")

12       In this case, Blankenship informed Plaintiff she was not allowed to eat at her desk and

13   that she was required to wear a mask on December 22, 2021, the day before Plaintiff's protected

14   activity.  *See* Dkt. 22, ¶¶13, 15.[5]  Blankenship also emailed Rodriguez on both December 22nd,

15   describing his "struggles" with Plaintiff, and on December 28th, alleging he had again observed

16   Plaintiff eating at her desk, after which he was advised Plaintiff could be written up for not

17   abiding by the rules.  Dkt. 18-1 at 53-54; *see also id.* at 28-29 (76:2-77:25).

18       Miller's notes of his December 28th conversation with Plaintiff and Blankenship provide

19   additional information.  Miller describes the issue of Plaintiff "[e]ating at her desk, which is in a

20   public and high-volume area . . . while mask mandate is in place[,]" and indicates Plaintiff

21   admitted she had been eating at her desk despite Blankenship's prior instruction:  "Rebecca

22   responded that she knows that she was asked to avoid eating and snacking at the desk and lost

23

---

[5] Plaintiff does not, for this reason, reasonably describe this email as being sent "in an apparent retaliatory act."  Dkt. 21 at 17.

1   track, but she would comply going forward. . . . ”  Dkt. 23, Ex. U.  These notes are consistent

2   with Plaintiff's description of events in her December 30th email to Willis:  “He pulled me into

3   the office with Ryan Miller on the phone.  He said he was writing me up for eating at my desk

4   when that same morning after having 5 days off I wasn't on the clock and I ate some apples.  I

5   took lunch and forgot about this supposed rule because I had been gone.” Dkt. 18-2 at 49.

6        In other words, the evidence shows that, before she engaged in protected activity,

7   Plaintiff was told she must wear a mask and could not eat at her desk, and, shortly thereafter, she

8   failed to abide by those instructions, resulting in the final warning.  Plaintiff does not, under

9   these circumstances, show that the reason for the adverse action had no basis in fact, was not

10  really a motivating factor, or lacked a temporal connection to the adverse action.  *See Scrivener*,

11  181 Wn. 2d at 447.

12       Nor does Plaintiff show that the reason given for the adverse action was not a motivating

13  factor in decisions for other employees in the same circumstances.  *See id.*  Plaintiff names other

14  employees observed “eating at their desk or workstation when they were not in an enclosed

15  room[,]” but does not contend those employees occupied a workspace similar to her own or

16  provide any detail that would allow for such an inference.  *See* Dkt. 22, ¶18.  She also observes

17  that the warehouse staff “ate in the public lunchroom[.]”  *Id*.  However, as she was advised at the

18  time, Plaintiff was similarly allowed to eat in the lunchroom.  Dkt. 23, Ex. I (Blankenship:  “No

19  more eating at your desk.  I want you to take your scheduled breaks and lunch and eat.  *If you*

20  *want to arrive early and eat [in the] lunchroom or your car I am fine with that*.  You need to be

21  in a mask in that office at all times.”) (emphasis added).  *See also* Dkt. 21 at 23 (Plaintiff argues:

22  “Blankenship, however, specifically authorized Popek and all employees to use the public

23

1   lunchroom to eat meals."); Dkt. 25, Ex. A at 54:3-5 (Blankenship: "The lunchroom was the only

2   place that – that we were not requiring [a mask], if they wanted to eat lunch in the lunchroom.")

3       There is, in sum, an absence of evidence from which a reasonable jury could infer that the

4   decision to issue the final warning was merely pretext or that retaliation was a substantial factor

5   in the adverse action taken.  Plaintiff thus does not carry her burden on pretext as it relates to the

6   final written warning.

7                           ii.    Performance issues:

8       Plaintiff disagrees with Defendant's assessment of her performance.  She contends her

9   only actual performance issue consisted of a single instance in which she admittedly erred in

10  directing materials to an incorrect address.  *See* Dkt. 22, ¶10; Dkt. 23, Ex. V at 64:24-65:14.  She

11  denies any other purported errors or deficiencies

12      In support of her argument, Plaintiff attests that she understood her performance

13  throughout the summer of 2021 to be satisfactory and perceived her Mid-Year Review as

14  generally positive.  Dkt. 22, ¶4.  However, "'[a]n employee's assertion of good performance to

15  contradict the employer's assertion of poor performance does not give rise to a reasonable

16  inference of discrimination.'"  *Mackey*, 12 Wn. App. 2d at 582 (quoting *Chen v. State*, 86 Wn.

17  App. 183, 191, 937 P.2d 612 (1997)).  Plaintiff cannot rely on her own subjective belief as to the

18  adequacy of her performance.  *See, e.g., Rahman v. Am. Tire Distrib., Inc.*, No. C13-0410-RSL,

19  2014 WL 6451296, at *4 (W.D. Wash. Nov. 17, 2014) ("The fact that plaintiff feels his

20  performance was satisfactory or that any defects could be justified does not raise a genuine issue

21  of material fact at this stage of the analysis: an employee's subjective personal judgment of his

22  competence, standing alone, does not establish falsity or pretext."); *Hedenburg v. Aramark Am.*

23  *Food Servs. Inc.*, 476 F. Supp. 2d 1199, 1207 (W.D. Wash. 2007) ("Other than Hedenburg's

1    subjective review of her performance, there is no evidence showing Hedenburg was performing

2    up to Aramark's expectations as required by the second element.")

3        Plaintiff also points to the positive observations in the Mid-Year Review and the absence

4    of any other reviews or relevant communications during the summer and fall of 2021.  *See* Dkt.

5    22, ¶5; Dkt. 23, Ex. X.  There are, however, numerous documented examples of performance

6    deficiencies.  For example, while positively assessing Plaintiff's customer service and handling

7    of deliveries, the Mid-Year Review signed by Blankenship on October 26, 2021 – some two

8    months before Plaintiff's complaint to Human Resources – critiqued the quality and

9    "commitment" of her performance.  Dkt. 18-1 at 49-51.  It cited specific examples, including

10   "simple mistakes . . . such as saving files to the incorrect drive" and failing to input CSR codes,

11   and that Plaintiff was reluctant about and required a stern warning to use the checklist prepared

12   to "help ensure she does not miss key functions."  Dkt. 18-1 at 49-51.  It noted Plaintiff's

13   defensiveness when corrected, resulting in an inability to learn quickly from mistakes.  *Id*.

14       Plaintiff denies any failures relating to CSR codes, stating she did not bear that

15   responsibility until October 2021 and pointing to her email that same month confirming she

16   would perform the task.  Dkt. 22, ¶6; Dkt. 18-2 at 36.  However, both the email evidence cited

17   and the Mid-Year Review reflect Plaintiff's failure to satisfactorily perform with respect to CSR

18   codes as of October 26th.  *See* Dkt. 18-1 at 49; Dkt. 18-2 at 36 (Miller: "Team Seattle . . .

19   continue to see . . . orders that do not have a CSR code . . . have asked why multiple times and

20   still occurring . . . today this needs to be put to bed and I need to clearly understand how this will

21   be completed each day, who is responsible, and how will be verified."; Plaintiff:  "I am

22   responsible for the CSR codes that go into Redwood.  Going forward from today and on, I will

23   make sure that before I print the freight bill that I will make sure that the CSR code is in there.")

*See also* Dkt. 25, Ex. B at 20:4-21:25 (Miller testified he reviewed shipping reports on a daily

basis and observed Plaintiff's failure to include shipment details). Other emails appear to reflect

an additional CSR code error in early November 2021. Dkt. 19, Ex. A (Miller: "Did this one

ship? If not – what was done in redwood to trigger it?"; Blankenship: "It was missed by

Rebecca. I called her in and spoke to her about it and she corrected it.")

Plaintiff also minimizes the significance of the checklist. She attests that she worked

with the checklist as allowed with changing circumstances throughout the day, and that

Blankenship disregarded and had no interest in the checklists she completed and returned. Dkt.

22, ¶ 8. Yet, it remains that Blankenship created the checklist to assist Plaintiff in completing

her duties, *see id.*, allowing for an inference Plaintiff required that assistance.

The record also shows other performance deficiencies documented prior to Plaintiff's

protected activity, including a request that she clean up returned materials and, as included on the

December 14, 2021 written warning, both a delivery error caused by Plaintiff's assignment of an

incorrect address and her failure to respond to a sales email. Dkt. 19, Ex. B; Dkt. 23, Ex. A; *see*

*also* Dkt. 18-1 at 38-42. Plaintiff admits the delivery error, but depicts it as a single mistake and

countered by the Mid-Year Review observation that she "makes sure that everything ships out on

the tracks and re sends [sic] deliveries as needed." Dkt. 18-1 at 48. She also denies ever failing

to properly respond to the sales team, stating she worked well with the sales team and that that

good working relationship angered Blankenship. Dkt. 22, ¶¶9-10.[6] However, the Mid-Year

Review observation came *before* the delivery error, *compare*, Dkt. 18-1 at 48, *with* Dkt. 23, Ex.

---

[6] Although Plaintiff specifically offered this reasoning in relation to an incident in January 2022, *see* Dkt. 22, ¶10, the Court assumes it is offered in relation to both of the incidents involving alleged failures to respond to the sales team, *see* Dkt. 18-1 at 39 & Dkt. 19, Ex. E.

A, and Plaintiff's mere assertion of satisfactory performance in relation to the sales team does not suffice to create a dispute of fact, *see Mackey*, 12 Wn. App. 2d at 582.

Plaintiff attempts to explain both the alleged failure to respond to a sales email and the issue with returned materials as a result of timing.  She notes there were occasions on which trucks returned or emails were sent after she had left work, and that requests from the sales team at times came in late in the day and could not be resolved before the close of business.  *See* Dkt. 21 at 5, 6, 15-16; Dkt. 22, ¶7.  She points to Blankenship's testimony acknowledging that trucks sometimes returned after Plaintiff left work, and that late requests from sales could not always be resolved on the same day.  Dkt. 23, Ex. V at 25:15-14, 44:10-19.  These arguments are not persuasive.  Blankenship's testimony about returning trucks addressed Plaintiff's "route tracker" tasks.  *Id*. at 25:2-24.  He clarified that Plaintiff's failure to respond to the sales team did not involve a situation "where it was a call late in the day and there was no time to assimilate all the information"; it was, instead, one of several instances in which a salesperson complained that Plaintiff had not responded to a call during her workday.  Dkt. 25, Ex. A at 63:6-64:20.  As related to returned materials, Plaintiff no more than speculates that the incident in question could have involved an issue of timing.

Plaintiff, moreover, almost entirely fails to address the evidence of performance issues occurring after her protected activity.  She does not, for the same reasons discussed above, show that she was wrongly accused of failing to respond to the sales team in early January 2022.  Dkt. 19, Ex. E (following two emails asking "Where's my stuff?????" and "Anything on this? Customer is asking again.", Blankenship asked:  "Rebecca – Why are we not responding to the sales team on this?", and Plaintiff replied:  "I will respond to these.  Get these taken care of.") She inaccurately asserts Defendant's failure to identify any other issues.  Dkt. 22, ¶11.  Plaintiff

therefore fails to refute evidence showing that, in January 2022, Blankenship asked Plaintiff to

catch up on her route tracker task, Plaintiff acknowledged she had missed an order, and

Defendant had to cancel an order that had been accepted despite the absence of available

materials.  Dkt. 18-2 at 52-56; Dkt. 19, ¶13, Ex. F (Blankenship on January 19, 2022:  "Can you

provide me an email you send on concern over this order?  You are the stop gap on these failures

and that's why we check the screens.  I saw other orders of concern in there today including the

PGI screen."; Plaintiff: ". . . I am not sure how we missed it but it is my fault that I overlooked

this.  . . . I will make sure and going forward it doesn't get missed and we get these orders out.";

Blankenship on January 24, 2022:  "Why are you pushing out these dates on fed ex and ltl? . . . If

they are fed ex and LTL zero prints why are you asking to push them out?  Let sales know we

don't have the material and they need to cancel the order.")

Plaintiff does address evidence associated with Miller, observing Miller did not discuss

any performance deficiencies in his December 2021 notes and stated he had observed her

successfully performing her daily tasks.  Dkt. 23, ¶14, Ex. U.  She also points to Miller's

testimony he had personally observed her work performance, observed automated daily reports

reflecting her work performance, and had observed evidence of her deficient performance, but

was unable to recall when that occurred.  *See* Dkt. 21 at 19 (citing Dkt. 23, Ex. W).  Yet, even if

Miller had observed Plaintiff successfully performing her daily tasks, it does not follow that her

performance was not deficient on other occasions.  Indeed, Miller testified that he works in

Kansas City, Missouri and is responsible for overseeing twelve distribution centers in

Defendant's western region.  Dkt. 25, Ex. B at 10:9-20.  Nor does the fact that Miller was unable

to recall precisely when he observed examples of Plaintiff's deficient performance create an

1    issue of fact. *Id*. at 20:4-21:11. The evidence, as a whole and as described above, provides

2    sufficient specificity.

3            Plaintiff further notes that the Year End Review inaccurately indicates she was "on a final

4    written warning" for failure to follow instructions as to the use of the checklist, running reports,

5    "as well as other issues[.]" Dkt. 23 at 19. As Plaintiff observes, the only behavior identified in

6    the final warning involved eating at her desk. *Id*. at 9-10. However, while the final warning did

7    not mention performance issues, Blankenship elsewhere identified those issues and advised

8    Plaintiff, in both the Mid-Year Review and the initial warning, of the need for improvement.

9    *See, e.g.*, *id*. at 4 ( "Rebecca lacks focus while performing her job. She has tools such as

10   checklists and calendar reminders that are being signed as complete but not being complete. . . .

11   Rebecca needs to show immediate improvement on the critical areas of her job. Rebecca needs

12   to use the daily check lists and training aids to insure [sic] her performance.") Read as a whole,

13   the Year End Review supports, rather than undermines the reasons given for the termination.

14   *See id*. at 16-19 (stating Plaintiff had been continually late with needed reports, had numerous

15   failures with CSR codes, "struggled in creating accurate load sheets" due to a lack of focus,

16   failed to use the checklist to reduce errors, and failed to run and send various reports, only

17   performing those functions after constant reminding).

18           Plaintiff, finally, points to interactions, or the lack thereof, between Blankenship and

19   Rodriguez. She asserts that the fact Blankenship did not seek out Rodriguez's assistance until

20   December 14, 2021 allows for an inference that he did not perceive her claimed deficiencies as

21   being so great he required the assistance of Human Resources. *See* Dkt. 21 at 13. She points to

22   Blankenship's later contacts with Rodriguez as showing he had "obviously started looking for

23   evidence to try and support a decision to terminate" her employment. *Id*. at 2 (citing Dkt. 23, Ex.

1   S (January 27, 2022 email to Rodriguez with Plaintiff's attendance record) and Ex. T (January

2   28, 2022 email attaching "[f]ailure to meet standards evidence")).[7]

3          Again, Plaintiff's arguments are not persuasive.  The court must make all *reasonable*

4   inferences in favor of Plaintiff.  *Reeves*, 530 U.S. at 150; *Mackey*, 12 Wn. App. 2d at 569, 572.

5   "Unreasonable inferences that would contradict those raised by evidence of undisputed accuracy

6   need not be so drawn."  *Snohomish Cnty. v. Rugg*, 115 Wn. App. 218, 229, 61 P.3d 1184 (2002).

7   *See also Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir.), *amended*, 340

8   F.3d 767 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat

9   summary judgment.")

10         The record in this case includes evidence of deficiencies both before and after

11  Blankenship first sought Rodriguez's assistance.  When he did seek that assistance, Blankenship

12  described his "struggles" with Plaintiff and her "continued mistakes . . . greatly impacting the

13  business." Dkt. 18-1 at 53.  Moreover, given the evidence of Plaintiff's ongoing performance

14  issues, it cannot be said that Blankenship's interactions with Human Resources in the days

15  leading up to the termination show he had "started looking" for evidence to support that decision.

16  In other words, the inferences suggested by Plaintiff are not reasonable in the face of the

17  evidence before the Court.

18         Plaintiff, in sum, does not show the performance deficiencies alleged by Defendant lack

19  any basis in fact, were not really a motivating factor in the decision to terminate her employment,

20  lack a temporal connection to that decision, or were not a motivating factor in employment

21  decisions for similarly situated employees.  *See Scrivener*, 181 Wn. 2d at 447.  She likewise fails

22

23         [7] Blankenship also asserts his belief that Plaintiff did not attend suggested trainings. Dkt. 19, ¶¶5-6, 10-11, Ex. D.  Plaintiff attests she attended all trainings provided to her and notes the evidence showing she asked for additional training. Dkt. 22, ¶3; Dkt. 23, Ex. U.  However, even taking Plaintiff's assertion as true, it remains that Defendant provides numerous examples of performance deficiencies.

1  to show that, although the stated reasons were legitimate, retaliation was nevertheless a

2  substantial motivating factor.  *Id.* at 446-47.

3        Plaintiff's mere disagreement with Defendant's conclusions as to the evidence of her

4  performance "does not mean that those conclusions were not the actual reason for her

5  termination."  *Mackey*, 12 Wn. App. 2d at 582.  Also, while the evidence could be said to show a

6  clash of personalities or dislike between Plaintiff and Blankenship, as well as differing views as

7  to the extent or seriousness of her deficiencies, this interpretation does not satisfy Plaintiff's

8  burden.  "[T]he Court's role is to remedy discrimination, not to assume the role of a super

9  personnel department[ ], assessing the merits – or even rationality – of employers'

10 nondiscriminatory business decisions."  *Shokri v. Boeing Co.*, 331 F. Supp. 3d 1204, 1220-21

11 (W.D. Wash. 2018) (finding plaintiff could not establish pretext, while observing that the record

12 "certainly shows a clash of personalities between Plaintiff and his new manager" and

13 "demonstrates differing views on Plaintiff's abilities.") (cleaned up and citations omitted).

14       Ultimately, and as with the final warning, Plaintiff fails to present sufficient evidence or

15 to demonstrate genuine disputes as to material facts that would allow a reasonable jury to find

16 Defendant's decision to terminate her employment based on alleged performance deficiencies

17 was merely a pretext to mask retaliation for her engagement in protected activity.  In the absence

18 of any evidence showing Defendant's actions were "actually driven by retaliatory intent[,]"

19 Plaintiff's claim is properly dismissed on summary judgment.  *Id*. at 1222-23 ("While Plaintiff is

20 entitled to all reasonable inferences from the evidence, at some point, the reasonable jury cannot

21 continue inferring without actual evidence."); *accord Kuyper*, 79 Wn. App. at 739.  *See also*

22 *Bell*, 599 F. Supp. 3d at 1079 ("Given the 'totality of the circumstances,' this case does not

23 present the 'close call' necessary to submit the issue of pretext to a jury.")

1          2.      <u>Disparate Treatment</u>

2          The Court also applies the *McDonnell Douglas* burden-shifting framework to disparate

3  treatment claims. *Hines v. Todd Pac. Shipyards Corp.*, 127 Wn. App. 356, 370-71, 112 P.3d 522

4  (2005). Defendant argues that, to meet her prima facie burden, Plaintiff must show (1) she

5  belongs to protected class, (2) was performing her job satisfactorily, (3) experienced an adverse

6  employment action, and (4) was treated less favorably than similarly situated individuals outside

7  of her protected class, or that other circumstances surrounding the adverse action give rise to an

8  inference of discrimination. *Nguyen v. Boeing Co.*, No. C15-793-RAJ, 2016 WL 7375276, at *3

9  (W.D. Wash. Dec. 20, 2016) (citing *Knight v. Brown*, 797 F. Supp. 2d 1107, 1125 (W.D. Wash.

10  2011)). Plaintiff denies the need to show satisfactory job performance, positing she need only

11  show she (1) belongs to a protected class, and (2) was treated less favorably, (3) than a similarly

12  situated, nonprotected employee, (4) doing substantially the same work. *Washington v. Boeing

13  Co.*, 105 Wn. App. 1, 13, 19 P.3d 1041 (2000).

14          The prima facie elements are not absolute and vary based on the relevant facts.

15  *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn. 2d 355, 362-63, 753 P.2d 517 (1988),

16  *abrogated in part on other grounds by Mikkelsen*, 189 Wn. 2d 516, 532. Courts, as such, apply

17  both of the above-described prima facie tests. *Compare Mikkelsen*, 189 Wn. 2d at 527, *with

18  Crownover v. State ex rel. Dep't of Transp.*, 165 Wn. App. 131, 147, 265 P.3d 971 (2011). The

19  Court finds no need to resolve the parties' disagreement in this case because Plaintiff fails to

20  establish a prima facie case of disparate treatment under any standard.

21          a.      <u>Final warning</u>:

22          Plaintiff does not show she was treated less favorably than any male employees. She

23  names other employees she observed eating at their desks or workstations in non-enclosed

1   rooms, but does not show or even contend those individuals occupied workspaces similar to her

2   own – "a large office/room which was not individually assigned to her as employees came in for

3   use of the copy machine etc." Dkt. 21 at 22; Dkt. 18, ¶¶18-19.  *See also* Dkt. 18-1 at 15-16

4   (50:5-15, 51:12-21); Dkt. 19, ¶14 (describing Plaintiff's workspace as a communal area

5   frequented by other employees and containing a will-call for walk-up customers); Dkt. 23, Ex. U

6   ("[Blankenship] asked why he continues to see [Plaintiff] eating at her desk when he had

7   previously requested she avoid eating at her desk for multiple reasons:  need to have mask in

8   work area due to mask mandate, her desk is in a public and high traffic area, and wanting to

9   make sure she took her breaks – being away from the job.")  She asserts that "male employees

10  were entirely free to associate and eat in the public lunchroom without masks" and without being

11  sanctioned.  Dkt. 21 at 22.  However, she also concedes she was likewise allowed to eat in the

12  lunchroom, as she was advised by Blankenship prior to receiving the final warning.  *See id.* at

13  23; Dkt. 23, Ex. I ("Rebecca – No more eating at your desk.  I want you to take your scheduled

14  breaks and lunch and eat.  If you want to arrive early and eat [in the] lunchroom or your car I am

15  fine with that.  You need to be in a mask in that office at all times.")  She takes issue with the

16  distinction made between eating in the "very public" lunchroom setting and her "large office[.]"

17  Dkt. 22, ¶18.  Yet, whether or not reasonable from a safety standpoint, this distinction does not

18  evidence disparate treatment.

19      Plaintiff also asserts that her "position was similar to other office administrative

20  individuals, sales staff, and warehouse employees", stating she was "not in management or an

21  exempt employee," and was "another worker facilitating the sale and distribution of building

22  materials." Dkt. 21 at 23.  Plaintiff may not, however, meet her burden through a broad

23  characterization of her employment status, or based on the mere fact she was employed in the

1    same business and at the same location.  As Defendant observes, "[i]ndividuals are similarly

2    situated when they have similar jobs and display similar conduct."  *Long v. Brusco Tug & Barge,*

3    *Inc.*, 182 Wn. App. 1052, 2014 WL 3937336, at *1 (2014) (citing *Vasquez*, 349 F.3d at 640-41),

4    *aff'd*, 185 Wash. 2d 127, 368 P.3d 478 (2016).  Plaintiff does not make this showing with respect

5    to the "sales staff" and "warehouse employees", and provides no detail whatsoever as to "other

6    administrative individuals[.]"  Dkt. 21 at 23; *see also* Dkt. 18, ¶¶2, 18-19.  She, for this reason

7    and for the reasons stated above, does not show the final warning demonstrated less favorable

8    treatment than a similarly situated, nonprotected employee doing substantially the same work.

9              b.    Termination:

10        Plaintiff offers little argument in support of a disparate treatment or other discrimination

11   claim as it relates to her termination.  She asserts that the evidence demonstrates she was

12   satisfactorily performing her job and points to the arguments offered in relation to her retaliation

13   claim as showing overwhelming evidence of pretext.  Dkt. 21 at 23.

14        Plaintiff's arguments as to her performance are not persuasive for the reasons discussed

15   above.  Plaintiff further fails to show that, through her termination for a failure to satisfactorily

16   perform her job responsibilities, she was treated less favorably than a similarly situated,

17   nonprotected employee doing substantially the same work, or that other surrounding

18   circumstances give rise to an inference of discrimination.  She does not, for example, identify

19   any similarly situated male employee with comparable performance issues who was afforded

20   more favorable treatment.  *See, e.g., Sim v. Dep't of Lab. & Indus.*, No. 39013-6-III, 2023 WL

21   2492146, at *7 (Wash. Ct. App. Mar. 14, 2023) (unpublished) (finding plaintiff failed to

22   establish a prima facie case of disparate treatment where the record did not include any evidence

23   of nonprotected employees with comparable performance problems receiving more favorable

treatment:  "[T]here is no evidence Ms. Sim's coworkers suffered from productivity problems or generated frequent customer complaints. That is, Ms. Sim has not furnished evidence that she and her peers were 'similarly situated.'")  "It is not discriminatory for an employer to show a preference for employees who are largely meeting job expectations over an employee who has numerous documented performance deficiencies." *Id*.  Any other contention made in relation to this claim is no more than conclusory and insufficient to survive summary judgment.

<u>CONCLUSION</u>

Plaintiff concedes her hostile work environment claim should be dismissed and Defendant demonstrates its entitlement to dismissal of the remaining, disputed claims. Accordingly, Defendant's Motion for Summary Judgment, Dkt. 17, should be GRANTED, and Plaintiff's claims and this matter should be DISMISSED.

<u>OBJECTIONS</u>

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **July 7, 2023**.

Dated this 20th day of June, 2023.

S. KATE VAUGHAN
United States Magistrate Judge